STATE of Maine

v.

Albert GAGNON.

Supreme Judicial Court of Maine.

March 8, 1978.

Michael E. Povich, Dist. Atty. (orally), Wayne S. Moss, Law Student, Ellsworth, for plaintiff.

Silsby & Silsby by Philip R. Foster (orally), Ellsworth, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Active Retired Justice.[1]

Charged by indictment dated April 3, 1975 with burglarizing the summer home of Charity P. Wolfe in Ellsworth on December 24, 1974, Albert R. Gàgnon (defendant) was found guilty by jury verdict in the Superior Court (Hancock County) of the reference crime pursuant to 17 M.R.S.A., § 754.[2] He appeals from the judgment of conviction and ensuing sentence. We deny the appeal.

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. 17 M.R.S.A., § 754 in pertinent part reads as follows:

"Whoever, with intent to commit a felony or any larceny, breaks and enters in the daytime . . . any dwelling house . . . shall be punished . . . if no person was lawfully therein and put in fear, by imprisonment for not less than 6 months nor more than 5 years or by a fine of not more than $500." This statute was repealed by Public Laws, 1975, c. 499, § 5, and replaced by 17–A M.R.S.A., § 401, effective May 1, 1976.

## Suppression of Defendant's Criminal Record

The defendant filed with the Court below a pre-trial motion to have the defendant's prior criminal record suppressed for use for impeachment purposes in the interest, as he argues, of fair play and substantial justice, since the defendant's possible involvement in the case depended upon circumstantial evidence. The presiding Justice denied the motion. We see no error.

Initially, counsel's strategic maneuver would raise as an issue the propriety of testing the admissibility of documentary evidence of records of conviction as well as testimonial evidence of identity of the person whose record of conviction is sought to be introduced by means of a pre-trial motion to suppress. In *State v. Perkins*, Me., 275 A.2d 586 (1971), we held that a motion to suppress like type of evidence was not within the contemplated operational scope of either Rule 12 or Rule 41, M.R.Crim.P.

However, in recognition of the Superior Court's inherent power of control over the procedures to be used in the trial of cases within its jurisdiction, provided the same are consistent with the Constitution of the State of Maine, our rules of court, or any applicable statute, and, in accord with Rule 57, M.R.Crim.P., which states that

> "when no procedure is specifically prescribed the court shall proceed in any lawful manner not inconsistent with the Constitution of the State of Maine, these rules, or any applicable statutes,"

this Court has sanctioned pre-trial determination on motions to suppress of such questions as the admissibility of confessions and in-court or out-of-court identifications. See *State v. Fernald*, Me., 248 A.2d 754 (1968); *State v. Barlow*, Me., 320 A.2d 895 (1974).

In *Barlow*, we said that such preliminary determinations may serve the interests of expeditious judicial administration, safeguard the purity of the trial and allow the accused an advance viewing of the case against him.

■ Notwithstanding the desirability of such advance judicial ruling on the admissibility of his criminal record, should the accused at trial choose to be a witness in defense of his innocence, we view the use of the pre-trial motion to suppress for such purpose within the scope of the trial justice's discretion. See *State v. Perkins*, supra.

■ We do not reach the issue, whether there was abuse of discretion in the trial Justice's denial of the defendant's motion to suppress, because the defendant-appellant failed to lay the foundation for a ruling by the Court below and for a decision by this Court. Indeed, the instant record discloses that no evidence was presented to the trial Court respecting the nature of the accused's criminal dossier, nor did the defendant proffer to stipulate as to his criminal convictions which he claimed should be suppressed, to the extent that the trial Justice remarked that there was nothing before him.

■ The appealing party is duty bound to see that the record on appeal includes all that is necessary to enable the Law Court to decide whether the rulings of which he complains were or were not erroneous. He must affirmatively show that he was prejudicially aggrieved, a burden which cannot be left to inference. See *State v. Gervais*, Me., 317 A.2d 796 at 802 (1974); *State v. Toppi*, Me., 275 A.2d 805 at 813 (1971); *Appeal of Bronson*, 136 Me. 401, 11 A.2d 613 (1940); *State v. Wombolt*, 126 Me. 351, 353, 138 A. 527 (1927); *State v. Dow*, 122 Me. 448, 449, 120 A. 427.

## District Attorney's Alleged Prejudicial Comment

■ The defendant did not testify. At the close of the District Attorney's rebuttal argument, the defendant's counsel, in the absence of the jury, made a motion for mistrial based on the District Attorney's supposed remark to the jury, which he said was made twice, in manner as follows: "Did defense give an innocent interpretation?" The District Attorney, in response to the Court's inquiry, stated:

"Your Honor, I can honestly say I don't recall the exact words I used. I do recall in rebuttal, I was responding to [defendant's attorney's] argument on innocent interpretation of certain facts. And I was simply responding to show that they should not confuse an innocent interpretation with an interpretation of guilt. But, this was just in direct response to [defendant's attorney's] argument.

"The Court: You don't recall how you said it? Do you deny that you said it in the manner that [defendant's attorney] has said?

"[District Attorney]: I cannot in good conscience deny it or admit it, Your Honor.

"The Court: Well

"[District Attorney]: But, I can certainly say I at no time comment either directly or indirectly on the defendant's failure to take the stand, because I know that's improper, and I try ethically to stay away from that.

"The Court: I'm going to take it under advisement and let it go to the Jury, and see what happens."

A motion for a new trial raising the identical point was later denied by the presiding Justice.

In *State v. Tibbetts*, Me., 299 A.2d 883 (1973), we said that

"it becomes the affirmative duty of a prosecutor to refrain from the use of equivocal or ambiguous language in argument,"

respecting the rights of the accused, and the duty of the jury to disregard his election, not to be a witness, not to mention any direct, unambiguous and specific statement thereon.

In *Tibbetts*, we cited with approval the rule enunciated in *Fontaine v. California*, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968):

"[W]hen a state jury is asked to convict a defendant on circumstantial evidence, and a constitutionally impermissible comment is made in argument, such comment cannot be considered harmless unless it is shown beyond a reasonable doubt that it did not contribute to the resultant conviction."

In *Tibbetts*, we formulated the rule in relation to equivocal or ambiguous prosecutorial comment on the failure of a criminal defendant to become a witness, that the State must then demonstrate beyond a reasonable doubt, for classifying the comment as harmless, that the record contains no evidence, either direct or circumstantial, which would rationally support acquittal.

In *Tibbetts*, the objectionable comment was reproduced in full in the context in which it was used. In the instant case, the objectionable statement appears out of any context in which it was made, so that any reference of the claimed impermissible comment to the defendant's failure to take the stand is wholly conjectural. Absent the Justice's charge to the jury, the defendant-appellant has deprived this Court from consideration of the probability that the Justice's instructions may have dissipated any possible link in the minds of the jury between the objectionable statement and the failure of the defendant to testify. We note that Gagnon personally requested a specific instruction on his right not to be a witness and on the jury's duty to disregard his election to remain silent at his trial. The defendant must be assumed to have been satisfied with the Justice's instructions in relation to this very problem as no objections were thereafter articulated.

Considering that the objectionable statement, in the absence of the context in which it was made, does not per se, directly or indirectly, refer to the defendant's election not to testify in his behalf, we cannot say that there was impermissible comment as claimed by the defendant. Furthermore, assuming the statement to be an equivocal or ambiguous comment by the prosecutor on the failure of the defendant to become a witness, we are satisfied from our analysis of this record that the evidence, albeit circumstantial, demonstrated beyond a reasonable doubt that such comment did not contribute to the resultant conviction as no rational basis for a verdict of acquittal existed. *State v. Tibbetts*, supra.

*Claimed Error in Admission of Evidence
Over Defendant's Objections*

The defendant contends that all the testimony which the State introduced in an attempt to prove concerted action between the defendant and two other persons, admitted in evidence over his objection, constituted reversible error on the ground that such evidence was irrelevant, immaterial and prejudicial. He lists this objectionable evidence as follows:

1. Tracks of a cowboy boot near the area of the alleged break;
2. tracks near a green pick-up truck;
3. tracks going away from the Wolfe residence;
4. description of the two men hitchhiking at approximately 7:30 p. m. between Ellsworth and Bangor on Route 1–A, one wearing cowboy boots;
5. testimony that a green pick-up truck stopped to pick up the two hitchhikers;
6. testimony relating to a green pick-up truck registered to Gloria Gagnon.

We rule that all this evidence to which the defendant objected was relevant and material in the circumstantial setting which the State presented to the jury in proof of the defendant's concerted participation in the burglary of the Wolfe residence. But in order to demonstrate its relevancy and materiality, we must relate what this record reveals respecting the investigation conducted by the police following an initial warning through an automatic alarm system at about 1:00 p. m. on December 24, 1974 that a break-in at the Wolfe residence was taking place.

Within very few minutes of the alert, the caretaker, Luray David Closson, and Officer Tweedy of the Ellsworth Police Department were at the premises. Closson made a quick entry into the dwelling house, noticing wet tracks on the kitchen floor and that certain articles, which he described, had been taken from other parts of the house and were lying on the floor in close proximity to an open window. Closson testified that he heard a "rushing" sound as if made from plastic as he approached the house, while Tweedy said that he heard a rustling noise coming from the woods located some 25 feet away from the rear of the building. Coordinating their pursuit of the intruder, Tweedy went northerly from the rear of the house towards the wooded area in the direction of the felon's tracks in the fresh snow, while Closson made a round-about run in the front of the building up the main road in an attempt to cut off the culprit at a woods road some 300 feet away. The strategy paid off as Closson met the defendant coming out of the woods, "puffing and breathing heavily," armed with an axe. Asked what he was doing there, Gagnon replied that he was looking for beehives. He did say that he had gone by the house and noticed the open window. He denied having a car, but indicated that he had seen two other people in the area.

When Tweedy reached them, he obtained for purposes of identification the defendant's driver's license which disclosed his residence as being in Oakland, Maine. Placed under arrest, the defendant was given his Miranda rights which he agreed he understood. Taken to the rear of the Wolfe residence in the vicinity of the open window which had a broken pane of glass in the area of the locking mechanism, the storm sash having been removed and lying against the building, Gagnon cooperated with Officer Tweedy by placing his right foot next to a footprint already in the area some two feet from the open window. The officer testified that fresh snow had fallen that morning and that the temperature in early afternoon was in the high thirty degrees. Both Closson and Tweedy described to the jury what they observed about the footprints, from which the jurors could infer that the two prints had common characteristics. There was testimony respecting other footprints in the area in the rear of the Wolfe residence, one of which was stated to be that of a cowboy boot.

In addition, Officer Tweedy said that he noticed some fresh paint chips on the bottom of the lower white sash and observed white smudges on the blade of the defendant's axe.

Later in the investigation, Closson met Officer Carter of the Ellsworth Police Department at a camp road some 500 feet north of the Wolfe residence, where both noticed a green Chevrolet pick-up truck with a green wooden camper-type homemade body built over the rear portion, in the vicinity of which some three sets of footprints were present. Lloyd D. Williams, a corporal in the Maine State Police, had joined the investigation at that time and corroborated the three sets of prints in that area, one of which was made, so he said, by a cowboy boot. He gave a description of the print. This same cowboy boot print, as well as a footprint from some other type of boot, he later followed from the wooded area in the rear of the Wolfe residence for a considerable distance toward the down-town area of Ellsworth. Officer Carter checked out the truck and found a registration for it in the name of Gloria Gagnon, Sawtelle Road, Oakland, Maine. The truck was removed by wrecker to the Ellsworth Police Department yard.

Officer Reginald Bennett of the Ellsworth Police Department, who had previously inspected the Gagnon truck in the police yard, was at the Hancock County jail when Mrs. Gagnon, at about 6:45 p. m., arrived in a dark blue or black Pontiac to pick up the truck. Upon proper identification, Officer Bennett gave her the registration and keys to the truck.

About one hour later, the officer was cruising on the Bangor Road in a northerly direction when he spotted two hitchhikers walking backwards in that same direction. He stopped and asked for identification. One fellow produced a driver's license which showed the name of Kelly, Oakland, Maine. He was wearing a lumberman's boot, with rubber bottom and leather top. The other fellow had a pair of cowboy-type boots with pointed toe and elongated heel. The officer's description that both were very wet half-way up their thighs was objected to after it was received, and the objection was sustained, but the evidence was never stricken from the record. Being suspicious of the two men, the officer then drove farther north in his cruiser, turned

around and parked without lights. He recognized them as they came to pass his vehicle. He testified that shortly thereafter he saw a dark blue Pontiac automobile go by followed by the green Chevrolet pick-up truck which he had previously inspected at the police yard. The car did not stop, but the truck picked up the two hitchhikers. On the defendant's motion to strike all of Officer Bennett's testimony, the Court below did tell the jury:

"That part which the witness has testified about the green truck stopping to pick up these two people that he's identified will be excluded. My wife might have stopped to pick them up, I don't know."

In explanation of his ruling, the Court stated in the presence of the jury that "there's been no evidence to indicate who was driving that truck, and what connection, if any, the Jury could attribute to the driver of that truck picking up these two people he's described."

■ Legal relevancy depends upon the legitimate tendency of the proffered evidence to establish or disprove a controverted fact in issue, while materiality goes to the weight of such evidence in helping resolve the matter. See *Towle v. Aube*, Me., 310 A.2d 259, at 265 (1973).

■ All facts which tend to establish a chain of circumstantial evidence with respect to the act charged are relevant and admissible in evidence, unless excludable under some rule or principle of law. *State v. Brown*, Me., 321 A.2d 478 (1974); *State v. Fitzherbert*, Me., 249 A.2d 760 (1969).

■ In the instant case, the evidence showed a close link between the footprints in the snow and the open window of the Wolfe residence, and a similar connection with the Gagnon pick-up truck. It was evident that there was some interrelation between these tracks in the snow. In view of such obvious group pattern, we hold that all the footprints in the fresh snow, those going away from the Wolfe residence, as well as those in the vicinity of the green pick-up truck, including the prints made by

the cowboy boot, and all the testimony relating to the two hitchhikers, inclusive of that describing their wet garments and that relating to the green truck stopping and picking up these two individuals, constituted by rational inference a consistent knit of a chain of circumstantial evidence logically tending to establish the defendant's actual participation in the burglary. All this evidence to which the defendant was objecting on the grounds of irrelevancy and immateriality was admissible, with its probative value to be assessed by the jury.

The Justice below committed no error in admitting the bulk of this evidence. His ruling on relevancy and materiality, anyhow, is not reviewable except for an abuse of discretion. See *State v. Gagne*, Me., 362 A.2d 166, 170 (1976); *State v. Westphal*, Me., 349 A.2d 168, 171 (1975); *State v. Northup*, Me., 318 A.2d 489, 493 (1974); *State v. Graves*, Me., 224 A.2d 57, 61 (1966). We see no abuse of discretion here. Relevant evidence is not required to be excluded merely because it suggests the defendant's involvement in the crime charged.

Insofar as the evidence of the condition of the hitchhikers' garments and their pickup by the green Chevrolet truck is concerned, we believe that such evidence was clearly admissible as part of a consistent whole of circumstances tending to prove the defendant's active participation in the breaking of the Wolfe residence with intent to steal as charged against him. The ruling excluding said evidence for jury consideration was favorable to the defendant and we see no prejudice to him by reason of the fact that the jury received knowledge of that evidence.

A defendant cannot be heard to complain about the trial court's rulings which are more favorable to him than he had a right to have. *State v. Scott*, Me., 343 A.2d 177, 179, n. 1 (1975).

■ Where, in the instant case, the evidence was admissible, but erroneously excluded from jury consideration by the trial Court, the fact that such evidence came to the attention of the jury during the course of the trial will not support a reversal of the ensuing conviction, because the defendant was not deprived of any right to which he was entitled. *State v. Peabody*, Me., 320 A.2d 242, 244 (1974); *State v. Foster*, 490 S.W.2d 662, 663 (Mo.App.1973); *Graham v. State*, 25 Ala.App. 44, 140 So. 621 (1932). See also, *Zimberg v. United States*, 142 F.2d 132, 136–137 (1st Cir. 1944).

### Sufficiency of the Evidence

The defendant contends that the jury verdict against him is against the evidence. This issue of the sufficiency of the evidence has been properly saved at the trial level for our determination.

The applicable test is, whether, in view of all the evidence in the case, the jury was warranted in believing beyond a reasonable doubt that the accused was guilty of the crime charged against him. *State v. O'Clair*, Me., 292 A.2d 186, 196 (1972); *State v. Goldman*, Me., 281 A.2d 8, 12 (1971).

■ It is argued that, given the fact the evidence of the defendant's participation in the burglary was wholly circumstantial, no rational jury could be justified in finding guilt beyond a reasonable doubt. With this conclusion, we disagree.

In the light of all the evidence, the hypothesis that the defendant was on the Wolfe premises merely in search of beehives was not reasonable. When each separate circumstance as appears in this case is viewed in the context of its relation to the others, the resulting pattern knitted together by the forceful rational inferences to be drawn from the several circumstances compels the irresistible conclusion of guilt. A conviction based on circumstantial evidence is not for that reason any less conclusive. *State v. Stewart*, Me., 330 A.2d 800 (1975); *State v. Cloutier*, 134 Me. 269, 186 A. 604 (1936).

The entry will be

Appeal denied.

Judgment affirmed.

WEATHERBEE, J., sat at oral argument and participated in consultation, but died prior to the preparation of the opinion.

DELAHANTY, J., sat at argument and conference, but did not otherwise participate.